1
2
3
4
5
6
7
8                        UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    ERIC ARGUELLO,                          Case No.   1:18-cv-00383-DAD-JDP

12                    Petitioner,             FINDINGS AND RECOMMENDATIONS TO
                                              DENY PETITION FOR WRIT OF HABEAS
13           v.                               CORPUS AND TO DECLINE TO ISSUE A
                                              CERTIFICATE OF APPEALABILITY
14    W. L. MUNIZ,
                                              ECF No. 22
15                    Respondent.

16

17           Petitioner Eric Arguello, a state prisoner represented by counsel, seeks a writ of habeas

18    corpus under 28 U.S.C. § 2254.  ECF No. 22.  Petitioner claims that: (1) there was insufficient

19    evidence to support his conviction of attempted murder of a police officer; (2) the trial court's

20    instructions erroneously precluded the jury from finding self-defense or defense-of-others; (3) the

21    trial court gave a flawed instruction on withdrawal from a criminal enterprise; (4) his right to

22    confront and cross-examine witnesses was violated; and (5) the cumulative effect of trial errors

23    rendered his trial unfair.  *See id.* at 7-8.  Respondent argues that some of petitioner's claims assert

24    only state-law error and thus do not entitle him to relief in this court, and that the Court of

25    Appeal's rejection of his other claims was reasonable.  *See* ECF No. 28 at 10.  For the reasons

26    stated below, we recommend that the court deny the petition.

27

28

                                                   1

1  **I.      Background**

2          In 2012, a jury sitting in Stanislaus County Superior Court convicted petitioner of two

3  counts of premeditated murder, two counts of premeditated attempted murder, active participation

4  in a criminal street gang, and felony vehicular evasion of a peace officer—and found certain

5  firearm enhancements.  *See People v. Arguello*, No. F069690, 2016 Cal. App. Unpub. LEXIS

6  9239, at *1 (Cal. Ct. App. Dec. 22, 2016); ECF No. 22 at 53.[1]  Petitioner was sentenced to 170

7  years to life plus two years and eight months in prison.  *Id.*  The California Court of Appeal

8  confirmed petitioner's conviction and the California Supreme Court denied review.  ECF No. 22

9  at 14.  Petitioner did not seek state-level habeas relief.  ECF No. 1 at 3.  We set forth below the

10  facts of the underlying offenses, as stated by the California Court of Appeal.  A presumption of

11  correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d

12  998, 1010-11 (9th Cir. 2015).

13

14              On or about August 31, 2009, Christopher Diaz (age 20) and Mark
                Ochoa (age 19) were shot to death outside of Diaz's residence in

15              northeast Modesto.  The killers also shot at a young man named
                William Harris, but Harris escaped with his life.  The incident

16              occurred around midnight, and several neighbors called 911 after
                being awakened by the sound of gunfire.

17              Officers Larry Meyer and Daniel Phillips of the Modesto Police
                Department responded to the reports of a shooting.  Their

18              dispatcher advised them of a suspect vehicle described as a red Ford
                F-150 pickup truck.  While driving to the crime scene in his marked

19              police cruiser, Officer Meyer spotted a red, four-door, Ford F-150
                containing four occupants.  He pursued the truck, and Officer

20              Phillips followed in a separate patrol car.

21              Officer Meyer got behind the F-150 as it moved eastbound on
                Floyd Avenue from the intersection with Oakdale Road.  The truck

22              accelerated to over 60 miles-per-hour (mph) in a 35 mph zone and
                ran a stop sign.  Officer Meyer activated the lights and siren of his

23              patrol car, but the driver did not pull over.  The truck entered a
                residential neighborhood at Grouse Crossing and made sharp turns

24              at Beacon Hill Lane and Boston Way.  As the chase continued
                down Boston Way, a person seated on the right passenger side of

25              the truck lowered his window and began firing a gun at the
                pursuing police car.  Officer Meyer briefly slowed down and

26

27  ───────────────────

28  [1] The full text of the Court of Appeal's opinion was appended to petitioner's amended petition as
    Exhibit A.  ECF No. 22 at 52-90.  Further citations to the opinion reference this exhibit.

reported over his police radio, "Shots fired, shots fired, he's shooting at us, shots fired."

From Boston Way, the truck turned on Massachusetts Way and then went north on Sunny Park Drive. Officer Meyer caught up with it on Sunny Park Drive as three men were exiting the vehicle. When the patrol car approached them, the person who had stepped out of the right rear passenger door fired more rounds in Officer Meyer's direction. The truck drove away, making a right turn at Suncrest Court, and the three passengers fled on foot.

After entering Suncrest Court, the F-150 parked in a driveway and turned off its lights. Police found Eric Arguello sitting in the driver's seat and took him into custody. An intensive manhunt for Arguello's passengers ended with the arrests of David Ferrel, Kelly Valle, and Victor Zapien.

Arguello, Ferrel, Valle, and Zapien were charged by information with murder of Christopher Diaz and Mark Ochoa (§ 187, subd. (a); counts 1 & 2); attempted murder of Officer Meyer in connection with the shooting on Boston Way (§§ 187, subd. (a), 664, subd. (a); count 3); attempted murder of Officer Meyer in connection with the shooting on Sunny Park Drive (count 4); attempted murder of William Harris (count 5); vehicular evasion of a peace officer (Veh. Code, § 2800.2; count 6 (Arguello only); and active participation in a criminal street gang (§ 186.22, subd. (a); count 9). Counts 1, 2, 3, 4, and 6 included gang enhancement allegations. Counts 1-5 were also alleged to have been committed with deliberation and premeditation, and were subject to firearm enhancements under section 12022.53. In addition, counts 1 and 2 contained special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)) and gang-related killing (*id.*, subd. (a)(22)).

The defendants were jointly tried before a Stanislaus County jury. Trial commenced on May 7, 2012 and ended on September 28, 2012 with verdicts on the charges against Arguello, Valle, and Zapien.

**Prosecution Case**

Key witnesses for the prosecution included victim Diaz's mother, Tamie Cox, and his friend, William Harris. Diaz and Ochoa were killed outside of Ms. Cox's home, which is where Diaz resided, and Ms. Cox was present for some of the events leading up to the shooting. She testified to coming out of her house that evening after hearing Ochoa arguing with someone. She found Ochoa speaking with an agitated and visibly intoxicated person whom she identified in court as defendant Valle. Diaz, Harris, and Arguello were also present during the argument between Valle and Ochoa.

Ms. Cox saw Valle yelling at Ochoa, declaring himself to be part of "SPN" and asking "[do] you bang?" She understood this language to be gang jargon. Ochoa identified himself and claimed to be from the "Deep South Side." Valle acted skeptical of this response and "got chest-to-chest" with Ochoa, at which point Ms. Cox intervened

and said there would be no fighting on her property.  Valle turned to her and said, "Shut up, bitch," which further angered Ochoa.  Ms. Cox told Valle to leave, and at the subsequent urging of Arguello, he complied.  Arguello and Valle departed in a red truck.  Ms. Cox went to bed and was later awakened by the sound of gunshots.

William Harris lived in the same neighborhood as Diaz and had been friends with him for several years.  Harris was also acquainted with Arguello and Ochoa, and testified that both of them were Norteno gang members.  He believed Ochoa belonged to a Norteno subset known as "South Side Modesto."  Harris first met Arguello approximately one month prior to the shooting and had socialized with him on a few occasions.  Arguello bragged about being a Norteno and often wore red clothing to signify his membership in the gang.  He also had what Harris referred to as "Northerner dots" tattooed on his hands.

On the night of the shooting . . . Arguello pulled up to Diaz's house in a red Ford F-150 truck.  He was accompanied by Valle, who Harris described as being "sloppy" drunk and belligerent.  Diaz and Ochoa walked over to speak with Arguello, and Diaz began chastising him for bringing such an intoxicated person to his house.  Harris did not hear the entire conversation, but understood Diaz was concerned about getting in trouble with his mother if she discovered a group of drunk people in her driveway.  Shortly thereafter, Tamie Cox came outside to see what was going on.

According to Harris, Valle looked at Ms. Cox and said, "What's up bitch," in a way that seemed like he was hitting on her.  Diaz was offended by the remark and removed his shirt in preparation for a fight.  Arguello was laughing at the situation but tried to be diplomatic, telling Diaz, "He's drunk, fool, just whatever ... We'll leave."  As they were heading back to the truck, Valle turned his attention to Ochoa and said, "What's up, fool? You bang? You bang?"  Ochoa responded, "Hell yeah, fool, South Side Modesto, Norte gang."  Valle replied, "I ain't never heard of you, fool. I ain't never seen you.  I'm gonna run your name.  What's your name?"  Ochoa said, "Sharky, fool, run it."  Valle pulled out a cell phone, made a call, and appeared to be talking to someone as he and Arguello were leaving.  Before they drove off, Valle warned that he would be back.

Arguello and Valle returned later in the evening, this time accompanied by two other people.  Arguello parked a few houses down from Diaz's residence before exiting his vehicle.

Diaz and Ochoa walked into the street anticipating a brawl.  Diaz tapped Harris on the back and said, "Let's bang on these fools right now . . . Lets do this."  Valle and his masked companions suddenly pulled out guns.  Valle aimed his firearm at Ochoa and demanded that Ochoa, Diaz, and Harris all get down on their knees.  The man with the dark-colored revolver held Diaz at gunpoint, while

4

Arguello stood to the side and taunted them, laughing and saying, "Talk shit now bitches, talk shit now."

Harris testified that Valle was the first person to fire his weapon; he shot Ochoa in the chest as Ochoa was backing away from him.

Police found Diaz lying dead in his driveway, shirtless and on his back. Ochoa's body was located inside the home of one of Diaz's neighbors. The residents of the house testified that Ochoa had come bursting through their door in the middle of the night, bleeding from a gunshot wound and holding a semiautomatic handgun.

Autopsy results showed that Ochoa died from a single gunshot wound to the chest. Diaz was struck by seven bullets, five of which were determined to have entered his body from behind. Four bullets, consisting of two different calibers, were recovered at the time of Diaz's autopsy; three were removed from his body and one was found inside of his clothing.

Although Harris's testimony suggested that Arguello and Valle had initially stopped by to invite Diaz to a party, he allegedly told police that the actual reason for their visit was to purchase drugs.

Photographs and eyewitness testimony established what the defendants looked like at the time of their arrests. Arguello was shown to have tattoos consisting of a single dot on his right hand, four dots on the knuckles of his left hand, and the letters "NSH" on his stomach.

Detective Robert Gumm of the Modesto Police Department testified as the prosecution's gang expert. Detective Gumm estimated that there were approximately 4,000 Norteno gang members living in Stanislaus County, with the Modesto area being home to 15-20 Norteno "sets," including the Smyrna Park Nortenos in Ceres, aka "SPN," and the Deep South Side Nortenos, aka "Deep South Side Modesto."

According to the expert, Norteno gang members identify with the color red and the number 14. The number 14 is significant because the 14th letter of the alphabet is N, which to them connotes Nortenos. Based in part on his education and experience, Detective Gumm testified that the primary activities of the Nortenos include theft offenses and violent crimes such as "assaults, assault with deadly weapons, felony assaults, drive-by shootings, and attempted murder and murder." Although Norteno subsets generally get along with each other, so-called "red on red crime," meaning one Norteno gang member victimizing another, was not uncommon in the Modesto area.

Detective Gumm opined that all four defendants were active participants in the Norteno criminal street gang. His opinion was based on information drawn from multiple sources, including personal knowledge and evidence of the events at issue in the current case . . . As for Arguello, the dots tattooed on his hands

5

were symbolic of the number 14, which is "a common sign for the Norteno gang."

Over defense objections, Detective Gumm was permitted to discuss and recite hearsay while explaining the basis for his opinions. Much of the challenged testimony related to the detective's claim that Arguello, Ferrel, Valle, and Zapien would each be classified as active Nortenos under a system used by the Modesto Police Department to "validate" gang members. The department relied on a multi-factor test under which a person was deemed to be a gang member if at least two of [ten] factors were established.

Relying heavily on "[p]olice reports, contacts from law enforcement, Probation Officer reports, [and] things like that," Detective Gumm determined that Arguello met seven of the ten criteria. He summarized eight prior contacts Arguello had allegedly had with police, spanning from an incident in October 2006 to his arrest in August 2009 for the currently charged offenses. On one or more of those occasions, Arguello purportedly admitted to being a member of the North Side Hayward Nortenos (thus explaining the "NSH" tattoo on his stomach); was observed wearing gang colors, having gang tattoos, and associating with known gang members; possessed "physical evidence known to be associated with gangs"; used gang-related words, phrases, or terms; and was arrested for crimes consistent with gang activity. Evidence pertaining to the crimes for which Arguello was being prosecuted was cited as proof of his association with gang members and an arrest for behavior consistent with gang activity.

The expert did not believe the offenses in this case were committed for the benefit of a gang or at the direction of a gang, but was of the opinion that each perpetrator had acted in association with a criminal street gang. He testified that the decedents may have been shot because they disrespected a highly active participant in the Norteno gang (Valle) and were perceived by their killers as being inactive Nortenos or low-level members/associates.

**Defense Case**

Valle testified on his own behalf. He admitted to being an active Norteno gang member affiliated with the Smyrna Park Nortenos subset.

On the day of the shooting, Valle started drinking beer at approximately 10:00 a.m. before tagging along with a friend to a birthday party for Arguello's mother. Valle had never met Arguello before that afternoon, but the two of them developed a friendly rapport. The tattoos on Arguello's hands signaled that he was a fellow Norteno. Valle explained: "When I seen the four dots, I knew right then. He didn't have to tell me."

The party continued into the night, and at some point Arguello invited Valle to go with him on an errand to buy cigarettes . . . they drove together in a red truck to a nearby gas station. Arguello

6

decided to stop at "his friend's house," i.e., the home of Christopher Diaz.

When they arrived at Diaz's residence, Valle introduced himself to Diaz and Ochoa and shook their hands.  Arguello spoke to Diaz and invited him to his mother's birthday party.  Diaz went inside of his house.  Next, for reasons not explained by Valle's testimony, Diaz came back outside with a gun in his hand and insisted that Arguello and Valle leave immediately.  Moments later, Diaz's mother came out of the house and said, "You guys need to leave now.  Leave my house now."

Nearly every detail of Valle's account conflicted with the testimony of Tamie Cox and William Harris.  In his version of events, there was no yelling, no gang-related conversations, no rude comment made to Diaz's mother, and no chest-to-chest confrontation with Ochoa.  When asked to leave, he promptly complied without making any threats to return at a later time.

After picking up Ferrel and Zapien at Valle's request, Arguello drove back toward his family's taqueria.  As they neared their destination, Valle asked Arguello to take a detour to Diaz's house.  Valle initially testified to making the request because he had wanted to "go fight one of those guys."  He revised this testimony on cross-examination, claiming that he had wanted to go back only to find out why Ochoa had been so unfriendly toward him, to determine if he had done something wrong, and "just because I didn't want no bad feelings between us."

As they pulled into the neighborhood, Zapien recognized Diaz's house and said, "Oh, my friend lives here.  Don't worry about it . . . . I'm going to take care of it."  Seconds later, Valle heard the sound of a gun being "racked" and turned to see Ochoa standing approximately 10 feet away from him with a pistol in his hand.  Valle glanced at Diaz again and saw that Diaz was pulling a gun out of his pocket or waistline.  When he looked back at Ochoa, Ochoa shot at him and missed.  Acting in self-defense, Valle pulled out his revolver and returned fire.

Following the initial exchange of gunshots, Ochoa and Valle continued shooting at each other while moving in different directions.  Ochoa darted across the street to a neighbor's house and Valle ran back to Arguello's truck.

By the time Valle reached the truck, Arguello, Ferrel, and Zapien were already inside the vehicle.  The group sped away and soon found themselves being pursued by police.  Arguello [was] in the driver's seat.

Valle's testimony described a chaotic scene inside of the truck.  There was no discussion of shooting at the police car.  He explained: "[A]s we're driving . . . I hear a gunshot."

When Arguello finally pulled over, his three passengers exited, ran toward a group of houses, and began climbing over a fence.  Valle

7

did not see anyone shoot at police during the course of these events or afterwards.  However, as he was climbing the fence, he heard a "big ole' noise" that sounded like someone falling to the ground, and at approximately the same time, a gunshot rang out.

To support the contention that Diaz was armed at the time of the incident, the defense presented testimony from a retained criminalist and firearms expert named Jacobus Swanepoel.  Mr. Swanepoel opined that a fragment collected at the crime scene had probably come from a .45-caliber bullet, which was unlikely to have been fired from any of the four guns seized by police.  However, he could not rule out the possibility that, as the prosecution's expert believed, the fragment had come from a .40-caliber bullet.

Arguello and Zapien did not testify, but Zapien called Ferrel as a defense witness.  Ferrel admitted to being a Norteno gang member and testified that his "good friend" Zapien was also a Norteno.  In terms of his connection to the victims, Ferrel disclosed that he had met Diaz one time prior to his death, in a meeting arranged by Zapien, and had sold Diaz marijuana on that occasion.  He had met Ochoa several years earlier, but their lone encounter was brief and unremarkable.

Ferrel was intoxicated on the night of the shooting.  When Arguello and Valle picked him up that evening, Ferrel believed they were taking him to a party.  Nevertheless, as "a natural reflex," he armed himself with a .40-caliber Glock pistol equipped with an extended magazine.  He also grabbed an extra clip of ammunition, which he placed in one of his pants pockets.

When Arguello pulled into Diaz's neighborhood, Ferrel recognized Diaz's house and confirmed with Zapien that it was the residence of a person to whom he had once sold drugs.  He was under the impression that they had arrived at a party, and did not anticipate any violence when he approached the house.  Ferrel watched as Zapien engaged someone in conversation at the end of the driveway, but did not realize that person was Diaz.

Ferrel was still looking in Zapien's direction when Ochoa appeared to his left and said, "What's up?"  He then heard the racking of a pistol, followed by a gunshot.  Next, Ferrel saw the person in the driveway (Diaz) turn his body away from Zapien and begin to pull out a gun.  Acting to defend Zapien's life and also to protect himself, Ferrel produced his weapon and fired approximately six shots at Diaz.  He then ran back to Arguello's truck and got into the right rear passenger seat.  Ferrel did not witness the actions of his co-defendants during the shootings, and specifically denied having any knowledge of Zapien being in possession of a firearm that evening.

Ferrel's testimony was inconsistent with the prosecution's theory that Zapien had used the .40-caliber Glock 22 pistol and was the

direct perpetrator of the attempted murders of William Harris and Officer Meyer.

Ferrel accepted responsibility for firing the Glock 22 during the police chase, but denied aiming at the police car: "First thing I was thinking is like I got to give myself some time, get the hell out of here, so I put my hand out the window and shot a couple times in the air." He subsequently disposed of the weapon by throwing it onto the roof of a house.

**Verdicts and Sentencing**

Appellants were convicted of all but one of the substantive offenses with which they were charged. The jury acquitted them on count 4, i.e., the (second) attempted murder of Officer Meyer in the shooting on Sunny Park Drive. The verdicts on the enhancements and special circumstance allegations were mixed and inconsistent. Despite concluding that Arguello and Zapien acted "intentionally, deliberately and with premeditation" in the commission of two first degree murders, the jury returned not true findings on the multiple murder allegations under section 190.2, subdivision (a)(3). Not true findings were made on all gang enhancements alleged pursuant to section 186.22, subdivision (b), as well as on the gang-related special circumstance allegations under section 190.2, subdivision (a)(22). However, appellants were ostensibly found to have violated section 186.22, subdivision (b) for purposes of firearm enhancement liability under section 12022.53, subdivisions (c) and (d).

While the jury may have concluded that Zapien personally and intentionally discharged a firearm in the commission of counts 1, 3, and/or 5, the inconsistent section 186.22, subdivision (b) findings were presumably consequential to him under count 2, and unquestionably dispositive as to Arguello since he was prosecuted only as an aider and abettor. We note that the firearm enhancement allegations appeared on the verdict forms as follows: "We further find that the defendant [was/was not] a principal in the foregoing offense, and that the defendant violated subdivision (b) of Penal Code section 186.22, and that at least one of the principals in the offense personally and intentionally discharge[d] a firearm and proximately caused great bodily injury, as defined in Section 12022.7, or death to any person other than an accomplice pursuant to Penal Code Section 12022.53[(c)/(d)] and 12022.53(e)."

Based on these convictions and findings, the trial court imposed the following prison sentences. As to Arguello, 25 years to life for the premeditated first degree murder of Christopher Diaz, plus 25 years to life for the firearm enhancement; an additional consecutive term of 25 years to life for the premeditated first degree murder of Mark Ochoa, plus 25 years to life for the firearm enhancement; an additional consecutive term of 15 years to life for the premeditated attempted murder of Officer Meyer, plus 20 years for the firearm enhancement; an additional consecutive term of 15 years to life for the premeditated attempted murder of William Harris, plus 20 years for the firearm enhancement; an additional consecutive term of 2

1  
2  years for active participation in a criminal street gang; and an additional consecutive term of eight months for felony evasion of a peace officer (one-third of the middle term).

3  ECF No. 22 at 54-70.

4  **II.    Discussion**

5       A federal court may grant habeas relief when a petitioner shows that his custody violates

6  federal law. *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

7  (2000).[2] Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

8  Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition. *See Harrington v. Richter*,

9  562 U.S. 86, 97 (2011). To decide a § 2254 petition, a federal court examines the decision of the

10  last state court to have issued a reasoned opinion on petitioner's habeas claims. *See Wilson v.*

11  *Sellers*, 138 S. Ct. 1188, 1192 (2018). In general, § 2254 requires deference to the state-court

12  system that determined the petitioner's conviction and sentence.

13       Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been

14  "adjudicated on the merits in state court proceedings" only if the state court's adjudication

15  resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly

16  established Federal law, as determined by the Supreme Court of the United States," or (2) "based

17  on an unreasonable determination of the facts in light of the evidence presented in the State court

18  proceeding." 28 U.S.C. § 2254(d).

19       If obtaining habeas relief under § 2254 is difficult, "that is because it was meant to be."

20  *Richter*, 562 U.S. at 102. As the Supreme Court has put it, federal habeas review "disturbs the

21  State's significant interest in repose for concluded litigation, denies society the right to punish

22  some admitted offenders, and intrudes on state sovereignty to a degree matched by few exercises

23  of federal judicial authority." *Id*. at 103 (citation omitted). Our habeas review authority serves as

24  a "guard against extreme malfunctions in the state criminal justice systems, not a substitute for

25  ordinary error correction through appeal." *Id*. at 102-03 (emphasis added).

26  
27  [2] This court has jurisdiction over the petition pursuant to 28 U.S.C. § 2241(a): "Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions."

28

1    This court reviews the last reasoned opinion—in this case, that of the Court of Appeal.

2    Because the Court of Appeal rejected petitioner's claims on the merits, the deferential standard of

3    § 2254 applies to his claims.

4    **A.      Sufficiency of Evidence**

5    Petitioner contends that there was insufficient evidence to support his conviction on count

6    3 for the attempted murder of Officer Larry Meyer, arguing that there was no proof that he aided

7    and abetted Ferrel's act of shooting.[3]  ECF No. 22 at 29.  The Court of Appeal found that the

8    evidence presented at trial, including petitioner's "presence, companionship, and conduct before,

9    during and after" the shooting permitted "a reasonable inference of guilt as an aider and abettor."

10   ECF No. 22 at 72.

11   Under the Fourteenth Amendment's Due Process Clause, no person can suffer a criminal

12   conviction "except upon sufficient proof—defined as evidence necessary to convince a trier of

13   fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v.*

14   *Virginia*, 443 U.S. 307, 316 (1979).  A habeas petitioner challenging the sufficiency of evidence

15   under *Jackson* must overcome "two layers of judicial deference."  *See Coleman v. Johnson*, 566

16   U.S. 650, 651 (2012).  On direct appeal, the appellate court decides "whether, after viewing the

17   evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found

18   the essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  On

19   habeas review, AEDPA's deferential standard applies, and a federal court may "overturn a state

20   court decision rejecting a sufficiency of the evidence challenge . . . only if the state court decision

21   was 'objectively unreasonable'" under AEDPA.  *Coleman*, 566 U.S. at 651 (quoting *Cavazos v.*

22   *Smith*, 565 U.S. 1, 2 (2011)).  The "only question under *Jackson*" is whether the jury's finding

23   was "so insupportable as to fall below the threshold of bare rationality."  *Id*. at 656.  It "is the

24

25

26   _____

27   [3] Petitioner was charged twice, under counts 3 and 4, with deliberate and premeditated attempted
     murder of Officer Meyer.  ECF No. 22 at 29.  Count 3 was based on the shooting on Boston Way,
     and count 4 on the shooting on Sunny Park Drive.  *Id*.  Petitioner was convicted of count 3 and

28   acquitted of count 4.  *Id*.

11

1  responsibility of the jury—not the court—to decide what conclusions should be drawn from

2  evidence admitted at trial." *Cavazos*, 565 U.S. at 4.

3      Applying this doubly deferential standard, the federal habeas court first examines state

4  law to identify the substantive elements of the offense and then turns to the federal question of

5  whether the state court's decision was "objectively unreasonable" in finding sufficient evidence.

6  *See Johnson*, 899 F.3d at 1056.  Here, the jury was required to "find beyond a reasonable doubt

7  that the attempted murder itself was premeditated and that [the] petitioner aided and abetted that

8  crime."  *See Lopez v. McDowell*, No. CV 17-0833-JLS (JPR), 2019 U.S. Dist. LEXIS 225583, at

9  *40 (C.D. Cal. Nov. 27, 2019); Cal. Pen. Code §§ 189, 664.  In California, attempted murder

10  requires a finding of specific intent to kill and a direct but ineffectual act toward accomplishing

11  the intended killing.  *See People v. Houston*, 54 Cal. 4th 1186, 1217 (2012).  Aiding and abetting

12  occurs where the defendant, acting with "(1) knowledge of the unlawful purpose of the

13  perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the

14  commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the

15  commission of the crime."  *People v. Marshall*, 15 Cal. 4th 1, 40 (1997).  A defendant must share

16  the direct perpetrator's intent to kill.  *See People v. Nguyen*, 61 Cal. 4th 1015, 1054-55 (2015).

17  "Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial

18  evidence is as sufficient as direct evidence to support a conviction."  *Id*. at 1055.  "Among the

19  factors which may be considered in determining aiding and abetting are presence at the crime

20  scene, companionship, and conduct before and after the offense."  *In re Juan*, 112 Cal. App. 4th

21  1, 5 (2003).

22      Considering the evidence presented at trial, a "rational trier of fact could have found the

23  essential elements of the crime beyond a reasonable doubt."  *Jackson*, 443 U.S. at 319.  The jury

24  heard evidence that petitioner was present at the scene of the crime and that his co-defendants

25  were fellow gang-members.  ECF No. 22 at 72; RT 10:2245-46; RT 11:447-48; RT 12:2837-38.

26  Petitioner witnessed his co-defendants shoot the first victims and therefore knew that they

27  possessed guns when they subsequently entered his vehicle.  ECF No. 22 at 72; RT 13: 2932-39;

28  2974.  Petitioner drove his co-defendants away from the scene of the first shootings—helping his

co-defendants flee police officers—and continued driving while Ferrel shot at Officer Meyer two to three times.  ECF No. 22 at 72; RT 2:445-48; RT 3:659-63; RT 4:718-23; RT 8:1727-36; RT 13:2948-49; RT 20:4731-32, 4798.  Petitioner drove at high speed and ran a stoplight.  RT 4:878, 885-89.  Petitioner pulled over to let Ferrel and his co-defendants out of the truck as they sought to elude pursuing police officers, and he himself then tried to escape by driving away.  ECF No. 22 at 72; RT 20:4733-35.

Under California law, a finding of aiding and abetting is warranted where the defendant encouraged or facilitated the offense with the intent that the crime be committed.  *See Marshall*, 15 Cal. 4th at 40.  Courts in our circuit have upheld as reasonable findings of aiding and abetting premeditated murder on facts similar to those presented here, including in cases in which intent was shown through circumstantial evidence.[4]  In viewing the evidence in the light most favorable to the prosecution, the petitioner has failed to show that no rational trier of fact could have found proof supporting petitioner's conviction as an aider and abettor of the attempted murder of the officer, *see Jackson*, 443 U.S. at 324, or that the jury's verdict was "so insupportable as to fall below the threshold of bare rationality," *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).  Therefore, the Court of Appeal's rejection of petitioner's insufficient evidence claim was not "objectively unreasonable," *see Coleman*, 566 U.S. at 651, and petitioner's claim does not merit habeas relief from this court.

---

[4] *See, e.g.*, *Bellows v. Adams*, No. CV 16-09608-DOC (SHK), 2019 U.S. Dist. LEXIS 176744, at *13 (C.D. Cal. June 28, 2019) (holding that there was sufficient evidence to support a conviction of aiding and abetting premeditated attempted murder in a case involving a shooting incident in which the petitioner knew that there was a gun in the car, drove herself and four fellow gang members to the victim's home, had a motive for revenge, acted as the getaway driver, and facilitated evasion of police officers); *Perez v. Muniz*, No. 1:18-cv-00190-LJO-SKO (HC), 2019 U.S. Dist. LEXIS 7312, at *30 (E.D. Cal. Jan. 15, 2019) (holding that a petitioner acted in concert with and shared the same intent as his co-defendant where the co-defendant shot the victim and the petitioner drove the co-defendant away from the scene); *August v. Montgomery*, No. CV 16-01595 JVS (RAO), 2017 U.S. Dist. LEXIS 156809, at *23-24 (C.D. Cal. July 17, 2017) (holding that a finding of specific intent to kill in the aiding and abetting of premeditated murder context was reasonable where the petitioner was with the shooter immediately before the shooting and provided the shooter with a means of flight).

**B.      Claims Resolved by Harmless Error Determinations (Claims 2, 3, 4)**

The Court of Appeal rejected petitioner's next three claims under a harmless error analysis, holding that any relevant errors failed to prejudice petitioner's defense.  When "a state court determines that a constitutional violation is harmless," as the Court of Appeal has done here, "a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  *Fry v. Pliler*, 551 U.S. 112, 119 (2007) (emphasis in original).  Harmless error is found where a constitutional error had a "substantial and injurious effect or influence" on either a jury verdict or a trial court decision.  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  A state-court decision is not unreasonable if "fairminded jurists could disagree on [its] correctness."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  To obtain relief, petitioner must show that the state court's harmless error determination "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Id.*

**1.      CALCRIM 3472 Instruction**

Petitioner argues that the trial court's use of Judicial Council of California Criminal Jury Instruction 3472 ("CALCRIM 3472") violated his constitutional rights to a fair trial and relieved the prosecution of its burden to prove all elements of the charged offenses beyond a reasonable doubt.  ECF No. 22 at 33.  Petitioner specifically argues that CALCRIM 3472, which instructs that "[a] person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force," is a misstatement of the law.  *Id.*  The Court of Appeal declined to analyze whether the instruction was erroneous, instead finding that any error was harmless.  *Id.* at 75.  Petitioner also argues that the Court of Appeal's harmless error determination was unreasonable.  *Id.* at 36.

Here, the Court of Appeal concluded that petitioner suffered no prejudice from the instruction—whether it was flawed or not.  ECF No. 22 at 77.  The appellate court found that the prosecutor, in her references to CALCRIM 3472, did not make an erroneous statement of the law.  *Id.*  The prosecutor referred to the instruction once in her closing statement, arguing that the

14

defendants went to Diaz's house for the purpose of killing him and Ochoa. *Id.*; RT 21:4864.[5]
However, the prosecutor also "repeatedly urged the jury to acquit the defendants if it believed that
they had acted in self-defense." *Id.* at 4867-68. Moreover, the jury found petitioner guilty of
premeditation and deliberation, indicating that the jury rejected the self-defense theory. ECF No.
22 at 78.

We cannot find that the Court of Appeal's harmlessness determination was unreasonable.
Petitioner has presented no evidence of prejudice resulting from the instruction and there is no
sign that CALCRIM 3472 influenced the jury's verdict in an unconstitutional manner. The jury
was also instructed, under Judicial Council of California Criminal Jury Instruction 200
("CALCRIM 200"), to disregard any instruction that was not relevant to the case, and petitioner
has presented no evidence that the jury failed to follow that instruction. *See Weeks v. Angelone*,
528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost
invariable assumption of the law that jurors follow their instructions"). Petitioner has failed to
show how the Court of Appeal's harmlessness determination was "so lacking in justification that
there was an error well understood and comprehended in existing law beyond any possibility for
fairminded disagreement."[6] *Harrington*, 562 U.S. at 101.

### 2.    Instruction on Withdrawal from a Criminal Enterprise

Petitioner claims that the trial court erred when it instructed the jury on withdrawal from a
criminal enterprise, violating his Fourteenth Amendment right to due process. ECF No. 22 at 39.

---

[5] The prosecutor's lone reference to CALCRIM 3472 was: "[A finding of self-defense is] not
available to those who seek to quarrel with the intent to create [an] excuse to use force. It's not
available to those who seek to quarrel. It's not available to those who intend to create an excuse
to use force. They were seeking a [quarrel]." RT 21:4867.

[6] Even if we were to look beyond the harmless error determination, we could not grant relief. To
obtain federal habeas relief for a jury instruction error, petitioner must show that the error "so
infected the entire trial that the resulting conviction violates due process." *See Estelle*, 502 U.S.
at 72. Where an ambiguous or potentially defective instruction is at issue, the court must ask
whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a way
that violated the constitution. *See id.* Here, the evidence supported the giving of CALCRIM
3472, and there is no evidence that the jury applied the instruction in an unconstitutional manner.
The jury heard that petitioner and Valle went to Diaz's house, where an argument ensued. The
petitioner and Valle then left and returned with Ferrel and Zapien, each with firearms. Valle
testified that he wanted to return to Diaz's house to fight. RT 20:4578-80, 4654.

1    The trial court instructed the jury on Judicial Council of California Criminal Jury Instruction 401

2    ("CALCRIM 401")—aiding and abetting—and included optional language on withdrawal from

3    the criminal enterprise as a defense to aiding and abetting.[7]  Specifically, petitioner argues that the

4    withdrawal instruction was irrelevant to him because he did not aid or abet any of the crimes and

5    therefore could not have withdrawn from any criminal enterprise.  ECF No. 22 at 39.  Petitioner

6    claims that this instruction led the jury to believe that it had to find that petitioner withdrew from

7    the criminal enterprise in order to find him not guilty of the crimes.  *Id*.  On appeal, the state

8    "essentially" conceded that the evidence did not warrant a withdrawal instruction.  *Id*. at 79.

9    However, the Court of Appeal ultimately rejected petitioner's claim, finding that any error in the

10    instruction failed to prejudice him.  *Id*.

11          The appellate court rejected petitioner's argument that CALCRIM 401 required the jury to

12    find that he withdrew from the criminal enterprise in order to find him not guilty.  ECF No. 22 at

13    79.  The appellate court found petitioner's interpretation "counterintuitive" because CALCRIM

14    401 also instructs that "the fact that a person is present at the scene of a crime or fails to prevent a

15    crime does not, by itself, make him or her an aider and abettor."  *Id*. at 79-80.  The Court of

16    Appeal stated that petitioner's theory of the instruction was "fanciful speculation," especially

17    considering the jury's findings of premeditation and intent to kill.  *Id*. at 80.

18

19

---

20    [7] The optional withdrawal language of CALCRIM 401, which the court included in the
instruction given the jury, is:

21

22            A person who aids and abets a crime is not guilty of that crime if
he or she withdraws before the crime is committed.  To withdraw,

23            a person must do two things: 1. He or she must notify everyone
else he or she knows is involved in the commission of the crime

24            that he or she is no longer participating.  The notification must be
made early enough to prevent the commission of the crime.  AND

25            2. He or she must do everything reasonably within his or her power
to prevent the crime from being committed.  He or she does not

26            have to actually prevent the crime.  The People have the burden of
proving beyond a reasonable doubt that the defendant did not

27            withdraw.  If the People have not met this burden, you may not

28            find the defendant guilty under an aiding and abetting theory.

1   We see no basis for federal habeas corpus relief here.  Petitioner's contention that the

2   withdrawal instruction improperly shifted the burden to him is not supported by the record.  ECF

3   No. 38-1 at 6.  Moreover, petitioner did not present any evidence, and we see nothing in the

4   record to indicate, that the jury believed that the *only* way to find petitioner not guilty of aiding

5   and abetting was to find that he withdrew from the criminal enterprise.  According to CALCRIM

6   401, petitioner's presence at the scene of the crime alone did not determine guilt.  Petitioner had

7   the opportunity to promote various defense theories at trial and to present a wide range of

8   evidence, including evidence that he did not aid and abet the crime.  And again, the jury was

9   advised, under CALCRIM 200, that it should disregard any inapplicable instructions.

10   Petitioner has failed to show how the Court of Appeal's harmlessness determination was

11   "so lacking in justification that there was an error well understood and comprehended in existing

12   law beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 101.

13   Therefore, the Court of Appeal's finding that the withdrawal instruction was harmless was

14   reasonable.[8]

15   ### 3.    Admission of Hearsay Testimony

16   Petitioner next argues that his Sixth Amendment right to confront and cross-examine

17   witnesses was violated when the prosecution's gang expert presented to the jury "case-specific,

18   testimonial hearsay."  ECF No. 22 at 43.[9]  According to petitioner, the prosecution's gang expert

19   improperly testified about the details of police reports and other hearsay sources in giving his

20   testimony.  *Id*. at 45-46.  On direct examination by the prosecution, the gang expert relayed the

21   details of petitioner's seven previous encounters with the police, including a previous arrest for a

22   gang-related incident and instances in which petitioner admitted gang membership, wore gang

---

[8] Even if we were to look beyond the harmless error determination, we could not grant relief.  The petitioner must show that that the instruction so infected the entire trial that the resulting conviction violates due process, *see Estelle*, 502 U.S. at 72, and not merely that the instructions as given were "undesirable, erroneous, or even universally condemned," *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  The jury was presented with evidence that petitioner was present before, during, and after the crimes, serving as the driver for the co-defendants throughout the incident.  Petitioner has not presented evidence of a due process violation.

[9] Petitioner argues that this testimony prejudiced all his convictions except count 6, felony vehicular evasion.  *Id.*

colors, and made gang hand signs.  RT 10:2331-33.  On cross-examination, the expert testified

that he did not conduct any independent investigation of the incidents described in the police

reports apart from speaking with one detective regarding the incident in which petitioner was

previously arrested.  RT 11:2690, 2697.

The Court of Appeal found that some of the expert's testimony was not hearsay and was

admissible, including general background information on the gang and opinions based on facts of

his own personal knowledge or independently-admissible evidence.  ECF No. 22 at 85.  But the

Court of Appeal found that, under *People v. Sanchez*, 63 Cal. 4th 665, 686 (2016), testimonial

statements relayed by the gang expert related to the defendant's alleged prior contacts with police,

including information from police reports, were inadmissible hearsay and infringed on

petitioner's confrontation rights.[10]  *Id.*  Despite its finding of a *Sanchez* violation, the Court of

Appeal determined that the error was harmless under *Chapman v. California*, 386 U.S. 18, 24

(1967), because it did not contribute to the verdict.[11]  ECF No. 22 at 85.  To the extent that

petitioner's confrontation clause claim rests on *Sanchez*, a California Supreme Court ruling, it is

not cognizable on federal habeas review.  *See Peters v. Arnold*, 765 F. App'x. 389, 390 (9th Cir.

2019) (holding that *Sanchez* "does not count as clearly established federal law," because it "is not

a United States Supreme Court decision"); *Zavala v. Holland*, No. 16-15984, 2020 U.S. App.

LEXIS 12076,  at *3 (9th Cir. Apr. 16, 2020) (same).

A federal habeas petitioner may be granted relief on a confrontation clause claim if he can

prove a confrontation clause violation under *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

Under *Crawford*, testimony cannot be admitted from an individual who is not present at trial

---

[10] Under *Sanchez*, case-specific out-of-court statements offered by an expert and not otherwise admissible are necessarily offered for their truth, in violation of the U.S. Constitution's Confrontation Clause.  *See* 63 Cal. 4th at 686.  Although *Sanchez* interpreted the U.S. Constitution to provide additional protections to criminal defendants, these additional protections have not been adopted by the Ninth Circuit or the U.S. Supreme Court.  *See Hernandez v. Robertson*, No. CV 18-08513-JGB (AS), 2019 WL 4364948, at *9 (C.D. Cal. July 19, 2019); *Smith v. Uribe*, No. CV 13-2444-VAP (SP), 2016 U.S. Dist. LEXIS 38945, at *15 (C.D. Cal. Jan. 12, 2016).

[11] The Court of Appeal found that the overwhelming amount of non-hearsay evidence at trial supported a finding that petitioner was in a gang.  *Id.*

unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine him. *See* 541 U.S. at 59. However, "[w]hen an expert testifies for the prosecution in a criminal case, the defendant has the opportunity to cross-examine the expert about any statements that are offered for their truth" and "[o]ut-of-court statements that are related by [an] expert solely for the purpose of explaining the assumptions on which [his expert] opinion rests are not offered for their truth and thus fall outside the scope of the confrontation clause." *See Williams v. Illinois*, 132 S. Ct. 2221, 2228, 2239-40 (2012); *United States v. Gomez*, 725 F.3d 1121, 1129-30 (9th Cir. 2013) (quoting *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009)) ("'The question is whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay. As long as he is applying his training and experience to the sources before him and reaching an independent judgment, there will typically be no *Crawford* problem.'"); *United States v. Vera*, 770 F.3d 1232, 1239 (9th Cir. 2014) (holding that a gang expert was not a "conduit for admission of hearsay in violation of *Crawford*" when he applied his training and experience to sources before him to reach an independent judgment about defendant's gang status and "did not impart [hearsay] information for its own sake, but to explain this basis for his expert opinion"); *Hernandez v. Robertson*, No. CV 18-08513-JGB (AS), 2019 WL 4364948, at *9 (C.D. Cal. July 19, 2019) ("[T]he United States Supreme Court has not held that a gang expert's reliance on hearsay testimony violates a defendant's confrontation clause rights under *Crawford*."); *Smith v. Uribe*, No. CV 13-2444-VAP (SP), 2016 U.S. Dist. LEXIS 38945, at *15 (C.D. Cal. Jan. 12, 2016) (finding no confrontation clause violation where a gang expert based his opinion that the petitioner was a member of a criminal street gang partly on statements made by other detectives about their interactions with the petitioner).

Here, the gang expert testified about petitioner's multiple gang-related encounters with the police, running from 2006 to 2009. ECF No. 22 at 45-46, RT 11:2321-33. He relied on information from police reports, phone calls with other gang detectives, and on his own numerous contacts with gang members in forming his opinion about petitioner's membership in the gang. RT 11:2484-86, 2658. The gang expert considered the "totality of the circumstances," opining that petitioner and his co-defendants committed the crimes in association with a street gang. *Id.*

1    at 2940; 2610-11; 2654; 2677-79.  Because the expert arrived at his own independent opinion and

2    was not "merely acting as a transmitter for testimonial hearsay," we are not convinced that a

3    *Crawford* violation occurred here.  *See Gomez*, 725 F.3d at 1129-30.

4            Even if a *Crawford* violation had occurred, such a violation would be harmless and would

5    not justify habeas relief "unless it 'had substantial and injurious effect or influence in determining

6    the jury's verdict.'"  *Ocampo v. Vail*, 649 F.3d 1098, 1114 (9th Cir. 2011) (quoting *Brecht v.*

7    *Abrahamson*, 507 U.S. 619, 623 (1993)).  Whether the evidence had a substantial and injurious

8    effect is guided by several factors: "the importance of the testimony, whether the testimony was

9    cumulative, the presence or absence of evidence corroborating or contradicting the testimony, the

10   extent of cross-examination permitted, and the overall strength of the prosecution's

11   case." *Whelchel v. Washington*, 232 F.3d 1197, 1206 (9th Cir. 2000) (citing *Delaware v. Van*

12   *Arsdall*, 475 U.S. 673, 684 (1986)).  Here, although the gang expert's testimony supported a

13   finding that petitioner was involved in a gang, the jury heard ample non-hearsay evidence to

14   reach the same finding independent of the expert's testimony.  Petitioner's tattoos, red clothing,

15   and red truck signified his gang membership, as did his affiliation with his co-defendants, two of

16   whom admitted gang membership.  RT 20:4555, 4590, 4621-22, 4638-4639-4640, 4700-01.  The

17   gang expert was cross-examined by petitioner's counsel.  RT 11:2463.  The prosecution presented

18   eye-witness evidence that petitioner was present during the shootings and that he drove his co-

19   defendants away from the scene of the shootings.  We cannot find that the gang expert's

20   testimony had a substantial or injurious effect on the verdict.  Therefore, we decline to grant

21   petitioner relief.

22           **C.     Cumulative Error**

23           Petitioner argues that the cumulative effect of multiple trial court errors violated his right

24   to due process.  ECF No. 22 at 49.  "The Supreme Court has clearly established that the combined

25   effect of multiple trial court errors violates due process where it renders the resulting trial

26   fundamentally unfair."  *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007) (citing *Chambers v.*

27   *Mississippi*, 410 U.S. 284, 298 (1973)).  Moreover, "[c]umulative error applies where, although

28   no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the

1   cumulative effect of multiple errors has still prejudiced a defendant." *Jackson v. Brown*, 513 F.3d

2   1057, 1085 (9th Cir. 2008).  To be granted relief, the petitioner must show that the combined

3   effect of the errors had a "substantial and injurious effect or influence in determining the jury's

4   verdict." *Brecht*, 507 U.S. at 623.

5            The Court of Appeal found that there was no evidentiary basis for the trial court's

6   instruction on withdrawal from a criminal enterprise and that some of the gang expert testimony

7   related inadmissible hearsay, in violation of *Sanchez*.  However, the Court of Appeal concluded

8   that these errors were harmless and, when considered cumulatively, did not rise to the level of

9   reversible and prejudicial error.  ECF No. 22 at 89.  The Court of Appeal's conclusion was not

10  unreasonable.  Petitioner makes no argument to support his claim that the alleged errors, when

11  combined, had a substantial and injurious effect on the jury's verdict.  Accordingly, petitioner is

12  not entitled to habeas relief on his cumulative error claim.

13  **IV.     Certificate of Appealability**

14           A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

15  court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

16  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

17  district court to issue or deny a certificate of appealability when entering a final order adverse to a

18  petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

19  Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

20  showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

21  the petitioner to show that "jurists of reason could disagree with the district court's resolution of

22  his constitutional claims or that jurists could conclude the issues presented are adequate to

23  deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

24  *McDaniel*, 529 U.S. 473, 484 (2000).  Here, petitioner has not made a substantial showing of the

25

26

27

28

21

1  denial of a constitutional right.  Thus, we recommend that the court not issue a certificate of

2  appealability.

3  **V.      Findings and Recommendations**

4        We recommend that the court deny the petition for a writ of habeas corpus, ECF No. 22,

5  and decline to issue a certificate of appealability.  These findings and recommendations are

6  submitted to the U.S. District Court judge presiding over this case under 28 U.S.C. § 636(b)(1)(B)

7  and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District

8  of California.  Within thirty days of the service of the findings and recommendations, petitioner

9  may file written objections to the findings and recommendations with the court and serve a copy

10  on all parties.  That document must be captioned "Objections to Magistrate Judge's Findings and

11  Recommendations."  The district judge will then review the findings and recommendations under

12  28 U.S.C. § 636(b)(1)(C).

13

14  IT IS SO ORDERED.

15

16  Dated:    June 12, 2020                                    UNITED STATES MAGISTRATE JUDGE

17

18  No. 206.

19

20

21

22

23

24

25

26

27

28